(No. 57897.—
BURL WARRIOR *et al.*, Appellees, v. JAMES R.
THOMPSON, Governor, *et al.*, Appellants.

*Opinion filed March 14, 1983.—Rehearing
denied May 27, 1983.*

Tyrone C. Fahner, Attorney General, of Springfield (Samuel K. Skinner, Special Assistant Attorney General, William A. O'Connor, Counsel to the Governor, and Jeffrey R. Tone, Timothy J. Carey, and Chaim T. Kiffel, of Sidley & Austin, of Chicago, of counsel), for appellants.

Sybille C. Fritzsche, Sherry L. Estes, Julian N. Henriques, Robert E. Lehrer, Diane Redleaf, Phillip H. Snelling, and Nelson A. Soltman, of Chicago, for appellees Burl Warrior *et al.*

Stanley Garber, Corporation Counsel, of Chicago (Jerome A. Siegan, Robert L. Janega, and Philip L. Bronstein, Assistant Corporation Counsel, of counsel), for appellee City of Chicago.

Richard M. Daley, State's Attorney, of Chicago (Jane Clark Casey, Deputy State's Attorney, and Susan Condon, Assistant State's Attorney, of counsel), for appellee County of Cook.

Nathan M. Cohen, Malcolm S. Kamin, and Judith I. Byrd, of Arvey, Hodes, Costello & Burman, of Chicago, for appellees Illinois Hospital Association *et al.*

Jacob Pomeranz, of Cornfield and Feldman, of Chicago, for *amici curiae* Robert Healey *et al.*

PER CURIAM: On January 19, 1983, plaintiffs, Burl Warrior, Robert Davis, Monica Deandrade and Katherine Collins, who describe themselves as "recipients under the Aid to the Medically Indigent Medical Program," filed this action in the circuit court of Cook County "on behalf of themselves and all others similarly situated" against the Governor of Illinois, the Illinois Department of Public Aid, and its Director, Jeffrey C. Miller. Plaintiffs Warrior and Collins also allege that they are "recipients of the General Assistance ('G.A.') Medical Program." The Illinois Hospital Association and several individually named hospitals, the County of Cook and the city of Chicago were granted leave to intervene.

In December 1982, the General Assembly enacted, and the Governor approved, the Emergency Budget Act (Pub. Act 82—1038, S.B. 1652), which authorized the establishment of contingency reserves in the funds appropriated for fiscal year 1983. Insofar as pertinent to this litigation it authorized the Governor to designate as a contingency reserve an amount no greater than 2% of the total appropriations of the agencies and departments under his jurisdiction.

On January 19, 1983, the Department of Public Aid, effective February 1, 1983, for a maximum of 150 days, adopted Emergency Rule sections 150.10, 150.20, 150.30, 150.40, 150.50, 150.60, 150.70, 150.80 and 150.90. Section 150.20 provides that because funds which were to have been used after January 1983 to pay for benefits for Aid to the Medically Indigent (AMI) (Ill. Rev. Stat. 1981, ch. 23, par. 7—1 *et seq.*) have been re-

served and are therefore unavailable for payment, "the Department shall not pay for medical services rendered on and after February 1, 1983 under the AMI program \*\*\*." The rule provides that persons who have been determined eligible for the program shall be maintained on the rolls and their eligibility periodically redetermined, that new applications shall be processed but that medical eligibility cards shall not be supplied during the period. It further provides that if the General Assembly "shall subsequently enact a subsequent specific appropriation for the purpose of funding AMI services, medical eligibility cards or other indicia of eligibility for AMI benefits shall promptly be supplied to persons then eligible for AMI and the benefits shall continue to be provided as long as such subsequent legislation shall permit."

Section 150.40 of the emergency rule effects a change in the regulation covering payment for inpatient hospital services. It provides that under the General Assistance Medical Program hospital bills will be paid only up to $500 per admission, "the client being financially responsible for costs over this amount up to an amount the Department would otherwise pay according to its rates; \*\*\*." It also lists a number of drugs which no longer are included in the Department's drug formulary and for which no payment will be made to the providers.

Section 150.70 provides that hospital rates established under Public Act 82—787 will be reduced by 7.5%. It sets forth the formula which will be applied in the establishment of hospital-utilization limits and repeats that pursuant to the provisions of section 150.40 General Assistance admissions will be paid up to $500 each.

In their complaint plaintiffs allege that the Department is required by article VII of the Illinois Public Aid Code (Ill. Rev. Stat. 1981, ch. 23, par. 7—1 *et seq.*) to provide "[a]id in meeting the costs of necessary medical, dental, hospital, boarding or nursing care, or burial" to

recipients of Aid to the Medically Indigent and that as the result of the emergency rule, as of February 1, 1983, the program will be entirely eliminated. Plaintiffs seek a declaratory judgment that the elimination of the AMI program violates the Illinois Public Aid Code, the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1981, ch. 127, par. 1001 *et seq.*) and the Emergency Budget Act of Fiscal Year 1983 (S.B. 1652) or, alternatively, that the Emergency Budget Act violates article II, section 1, article VIII, section 2(b), and article IV, section 9(d), of the Illinois Constitution. They also ask that defendants be enjoined from eliminating the AMI program, enjoined from the elimination of inpatient hospital services in excess of $500 per admission for General Assistance medical recipients, and for other relief.

The complaint of the intervenor County of Cook alleges that individuals currently being provided services through the AMI program will seek assistance at Cook County Hospital after February 1, 1983, that Cook County Hospital is currently operating at or near its maximum capacity and will be unable to handle a substantially increased load on short notice; that the increased financial burden placed upon the hospital by the defendants' actions threatens the future of the hospital and its continued ability to provide services for those in need; that the manner in which defendants have provided for the contingency reserves from the funds appropriated for General Assistance results in reserving $91 million rather than $54.6 million, the latter sum being equivalent to 2% of the sum appropriated and being the amount set forth in the Governor's notice to the Comptroller and the officers of the General Assembly in compliance with section 4 of the Emergency Budget Act. Intervenor seeks a declaratory judgment that the elimination of the AMI program violates the Illinois Public Aid Code and the Emergency Budget Act, or, alterna-

tively, that the Emergency Budget Act violates article II, section 1, article VIII, section 2(b), and article VII, section 9, of the Illinois Constitution, and also prays for injunctive and other relief.

In the second count of its complaint, intervenor Cook County alleges that approximately 111,000 individuals are currently eligible for General Assistance payments in Chicago and Cicero. Payments last year on behalf of General Assistance recipients statewide averaged approximately $1,800 per hospital admission. It alleges that the reduction of payment for inpatient services to a total of $500 per admission between February 1 and June 30, 1983, will cost the county in excess of $2.5 million. It further alleges that the increased financial burden placed upon the hospital by the sudden and drastic cutback in State reimbursement seriously threatens the future of the hospital. It prays for a declaratory judgment, injunctive and other relief.

The complaint of the intervenor city of Chicago alleges that elimination of AMI will affect approximately 14,000 recipients who reside in the city of Chicago, that those former recipients of AMI will seek medical services at other city health facilities which will as a result be overburdened, causing a strain on the financial resources of the city. The city seeks a declaratory judgment, injunctive and other relief.

The complaint of the intervenors Illinois Hospital Association and several of its member hospitals describes the "methodology," which will be discussed later, for fixing per diem or per visit rates for hospitals for fiscal years 1982 and 1983. They ask that the court enjoin the defendant Director "from giving any force and effect to the Emergency Rules of January 19, 1983" and that the court issue a mandatory injunction directing the defendant Director to process interim claims for hospital services rendered pursuant to articles V, VI and VII of the

Illinois Public Aid Code in compliance with the payment methodology expressly set forth in Public Act 82—787 and in Rule 4.13.7 adopted by the Illinois Department of Public Aid on November 30, 1982. These intervenors also seek a declaratory judgment and other relief.

The parties entered into a "joint statement" of the effect of permitting the emergency rules to go into effect. Following consideration of memoranda and oral argument the circuit court found that plaintiffs have a reasonable likelihood of prevailing on the merits on the issues; that the emergency rules violated the rights of plaintiffs under the Illinois Public Aid Code; that the emergency rules were not authorized by the Emergency Budget Act; that the Emergency Budget Act constituted an unconstitutional delegation of power under the Illinois Constitution; and that plaintiffs would suffer "immediate, certain and greater damage if a preliminary injunction does not issue than would defendants or the public at large if the preliminary injunction does not issue so that the hardships balance in favor of the plaintiffs." The court, on January 31, 1983, entered an order granting a preliminary injunction in which it enjoined the defendants:

"(a) From eliminating, suspending or otherwise terminating the Aid to the Medically Indigent Program;

(b) From limiting inpatient hospital care to $500 per admission under the GA program;

(c) From giving any force and effect to the IDPA 'Emergency Rules' adopted on January 19, 1983;

(d) From paying medical providers entitled to payment under P.A. 82—787 otherwise than in accordance with P.A. 82—787.

\* \* \*

(f) Nothing contained herein shall be deemed to enjoin Defendant James R. Thompson from complying with any procedural requirements of P.A. 82—1038, such as certification of line item 'reserves' to the General Assembly."

Defendants appealed, and upon allowance of their motion filed under Supreme Court Rule 302(b) (87 Ill. 2d R. 302(b)), the appeal was taken directly to this court. We ordered an expedited briefing schedule and on February 17, 1983, heard oral argument.

Defendants contend that the circuit court abused its discretion in issuing the preliminary injunction, that the Emergency Budget Act does not provide for a delegation of the power to reserve appropriated funds violative of the constitutional doctrine of "separation of powers," that the Governor's application of the Emergency Budget Act does not constitute an implied repeal of the Aid to the Medically Indigent statute, that the $500-per-admission limitation on inpatient hospital care under the General Assistance Medical Program does not violate the equal protection clause, that Public Act 82—787 does not unqualifiedly entitle the intervenor hospitals to the total of $797.5 million, and that the injunction issued by the circuit court was overbroad, and therefore void.

There is one issue which involves only the hospital intervenors and will be discussed later. We turn our attention now to issues common to plaintiffs and intervenors. The parties have argued the question whether Senate Bill 1652 is an appropriation measure or "substantive" legislation, but we need not and do not further consider that precise question. The question presented, irrespective of the nature of the legislation, is whether the General Assembly vested the Governor with authority to designate the contingency reserves in question without providing sufficient standards for the exercise of the authority thus conferred.

This court has enunciated the criteria relevant to determining the validity of a legislative delegation of power to an administrative agency, and we see no reason why the same criteria should not apply to the delegation of power to an executive officer. In *Hill v. Relyea* (1966), 34 Ill. 2d 552, 555, this court stated:

"Absolute criteria whereby every detail necessary in the enforcement of a law is anticipated need not be established by the General Assembly. The constitution merely requires that intelligible standards be set to guide the agency charged with enforcement [citations] and the precision of the permissible standard must necessarily vary according to the nature of the ultimate objective and the problems involved. [Citations.]"

Senate Bill 1652 provides that the contingency reserves authorized shall not exceed a total of $164 million, that no contingency reserve may be established out of appropriations for the payment of salaries fixed by law for State officers, that the contingency reserve may not exceed 2% of the total appropriations made from the General Revenue Fund to an agency, that the contingency reserves are limited to 2% of certain agencies' appropriations, including the Department of Public Aid, with the further limitation that the computation of the 2% be based on the appropriation "exclusive of the amounts appropriated for the operations budgets of the Department of Public Aid." In view of the fact that the purpose of the statute is simply to create a contingency reserve of $164 million, we hold that the standards provided therein are sufficient. *Northern Illinois Auto Wreckers & Rebuilders Association v. Dixon* (1979), 75 Ill. 2d 53, 61; *Stofer v. Motor Vehicle Casualty Co.* (1977), 68 Ill. 2d 361.

Plaintiffs contend that funds appropriated in the appropriation bill for the Public Aid Department (Pub. Act 82—845) for Aid to the Medically Indigent and General Assistance inpatient hospital services are available, and that the Governor is without constitutional power to eliminate those services. Although not articulated in precisely that manner, we construe plaintiffs' argument to be that assuming that the Governor were vested with power to reduce the various line items for medical services for article V (Medicaid) (Ill. Rev. Stat. 1981, ch. 23, par. 5—1 *et seq.*), article VI (General Assistance) (Ill. Rev. Stat. 1981, ch. 23, par. 6—1

*et seq.*), and article VII (Aid to the Medically Indigent) (Ill. Rev. Stat. 1981, ch. 23, par. 7—1 *et seq.*), he could reduce only the line items available for each of those programs.

The fallacy in plaintiffs' argument is that the appropriation for hospital inpatient care, physicians, prescribed drugs, hospital outpatient care and a number of the items involved in the designation of the contingency reserves were appropriated as line items under a single heading "For Medical Assistance and Local Aid to the Medically Indigent under Article V, VI and VII." Articles V, VI and VII contain provisions for eligibility requirements (see Ill. Rev. Stat. 1981, ch. 23, pars. 5—2, 6—1, 7—1), and in each instance the amount and nature of payments is to be determined in accordance with standards, rules and regulations set and promulgated by the Department. (See Ill. Rev. Stat. 1981, ch. 23, pars. 5—4, 6—2, 7—2.) There is no provision in either article VII (AMI) or in the appropriation bill (Pub. Act 82—845) setting forth minimum amounts or percentages of appropriated funds for any of the three programs. The statutory scheme vests great discretion in the Department, and we are unable to say that the defendant Department exceeded its powers when it determined that during the period here in question no portion of the appropriated funds will be paid for aid to the medically indigent.

Plaintiffs contend that even if there were no statutory duty to provide hospital services to General Assistance recipients, the elimination of these services draws an impermissible distinction between classes of recipients in violation of the equal protection clause of article I, section 2, of the Illinois Constitution. They argue that the distinction drawn is between recipients who are seriously ill and in need of inpatient hospital care and those recipients not ill enough to require hospitalization. They contend that defendants' policy "denies plaintiff class members the hospital care they need while providing for the needs of the recipients who have less serious medical needs."

The appropriate standard of judicial review in determining whether plaintiffs were denied equal protection is the "rational relation test." (*United States Railroad Retirement Board v. Fritz* (1980), 449 U.S. 166, 174, 66 L. Ed. 2d 368, 376, 101 S. Ct. 453, 458-59.) If there is some reasonable basis for the classification it is not rendered invalid because the classification results in some inequality.

The question of the extent of permissible budgetary limitations is not for us to decide. It has been determined in this instance by the General Assembly and the Governor, and in compliance therewith the Department has adopted regulations pursuant to which the expenditures will be made. Whether the allocation of the funds would be precisely the same were the decision ours to make is irrelevant; the fact that we might disagree does not render it irrational or invidious. We see no constitutional defect in the program and do not agree that plaintiffs have been denied the equal protection of the laws.

The intervenor Illinois Hospital Association and the several intervenor hospitals contend that the circuit court correctly enjoined the defendants from "departing from the payment methodology spelled out in P.A. 82—767 and embodied in [the Department's] Rule 4.13.7." Public Act 82—787 (S.B. 1654) was approved and became effective on July 13, 1982. It provides, *inter alia,* for the method of calculating costs of inpatient and outpatient care and clinic services, and that "interim rate payments shall be made from the available fiscal year 1983 appropriation. The Department shall spend $797.5 million during the twelve-month period July 1, 1982 through June 30, 1983." Regulation 4.13.7, effective November 30, 1982, implements Public Act 82—787 and states that changes were made in the rule "to assure that the Rule is consistent with Senate Bill 1654."

Public Act 82—787 and Regulation 4.13.7 provide a "methodology" which in substance requires that each hos-

pital's full per diem or per visit rate for the inpatient, outpatient and clinic service be calculated based upon the hospital's most recent Medicaid cost report on file with the Illinois Department of Public Aid on December 31, 1981. The per diem rate from the cost report is then "trended" forward to January 1 in accordance with an inflation index provided by Data Resources, Inc. Each hospital is then given an allotment of Public Aid days and visits premised upon a basic percentile of expected usage. The allotted days and visits comprising the "allowable covered service units" for each hospital are then multiplied by the trended per diem or per visit rate to achieve a prospective total expenditure to that hospital. The total or prospective expenditures for all hospitals are then compared to the total "amount available," which in this instance would be the $797.5 million appropriation less certain deductions used for 1982 reconciliations and a fund which was used to provide relief for certain financially distressed hospitals. Each hospital's full "trended" rate is then reduced by the proportion by which anticipated payments exceed the amount available in order that the total 1983 fiscal year expenditure not exceed $797.5 million. Based on this methodology the Department determined that approximately $490 million were available for fiscal year 1983 services. Hospitals have been receiving payments for fiscal year 1983 services in accordance with the rates thus determined.

The intervenor hospitals argue that a statute must be construed, if possible, in a manner that would render it constitutional, and that to hold that the Emergency Budget Act implicitly repealed any part of Public Act 82—787 would render it unconstitutional. They argue that because Public Act 82—787 was enacted earlier and deals with a special and limited subject, and Public Act 82—1038 was adopted later and is general, the specifics of Public Act 82—787 must prevail over the general language of Public Act 82—1038.

It is apparent that a number of factors enter into the determination of the sums which will ultimately be paid to any individual hospital. It cannot be determined from this record whether under the methodology provided in the statute, and the original rules, the sum of $797.5 million would necessarily have been disbursed, nor can it be determined that the creation of the contingency reserve will reduce the amount available for payment below the sums actually required during the fiscal year. Furthermore, it is apparent that the methodology provides for reconsideration and review of payments and under certain conditions for the payment of additional sums. Under these circumstances it does not appear that a preliminary injunction was necessary in order to prevent irreparable harm to the intervenors.

Intervenors contend that the defendants were without power to adopt the emergency rules. Citing *Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, they argue that an agency's powers cannot exceed those provided for it by the General Assembly. They argue that nothing in the Illinois Public Aid Code authorizes the emergency rules and that they are in direct conflict with Public Act 82—787 and with Rule 4.13.7 adopted on November 30, 1982. They argue further that the Emergency Budget Act does not purport to authorize the emergency rules.

Section 12—13 of the Illinois Public Aid Code (Ill. Rev. Stat. 1981, ch. 23, par. 12—13) authorizes the Department to "make all rules and regulations *** as may be necessary or desirable for carrying out the provisions of this Code ***." It further provides that the provisions of the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1981, ch. 127, par. 1001 *et seq.*) are incorporated therein and apply to all administrative rules and procedures.

Intervenors do not contend that the defendants failed to comply with the formal requirements of the Illinois Administrative Procedure Act in the adoption of the emer-

gency rules. In our opinion the general grant of power contained in section 12—13 is sufficient to authorize the action taken. Intervenors' contention is that there was no emergency which would serve to authorize the adoption of the rules, but in the posture of the case and on this record that is not before us for determination. The only question presented on this record is whether the emergency rules were promulgated in compliance with the provisions of the Illinois Administrative Procedure Act, and we hold that they were.

Ordinarily the scope of review of an order granting a preliminary injunction is limited (see *Dixon Association for Retarded Citizens v. Thompson* (1982), 91 Ill. 2d 518), but here, as in that case, the order "is, in effect, a decision on the merits of the case." (91 Ill. 2d 518, 525.) For the reasons heretofore stated we are of the opinion that with respect to the contentions of the plaintiffs, the defendants acted within the scope of the discretionary powers conferred upon them by the relevant legislation. Insofar as their contentions are concerned, we conclude that intervenors have failed to show that a preliminary injunction was necessary in order to prevent irreparable harm. With respect to the issues presented in the action of intervenors for a declaratory judgment that the defendant Department of Public Aid and its Director are required by law to comply with the terms and provisions of Public Act 82—787, that issue cannot be determined on this record. Furthermore, we are unable to determine from the pleadings whether the issue presented is one in which jurisdiction is vested in the Court of Claims. (See Ill. Rev. Stat. 1981, ch. 37, par. 439.8(a).) For the reasons stated, the order of the circuit court is reversed and the cause is remanded to the circuit court of Cook County with directions to dismiss the complaints.

*Reversed and remanded,*
*with directions.*

16

JUSTICE WARD, concurring in part and dissenting in part:

Section 150.40 of the emergency rules changes the regulation covering payment for inpatient hospital services and provides that, under the General Assistance Medical Program, hospital bills will be paid only up to $500 per admission, with "the client being financially responsible for costs over this amount up to an amount the Department would otherwise pay according to its rates. ***" I consider that the effect of section 150.40 is to violate the constitutional assurances of equal protection.

The plaintiffs contend that the distinction drawn under section 150.40 is between recipients who are seriously ill or injured and require inpatient hospital care and those whose medical problems are not sufficiently severe to require hospitalization or to require only the briefest of hospitalization and only perfunctory care not exceeding a cost of $500. In summary and unconvincing fashion the majority dismisses this argument, observing simply that if there is some reasonable basis for the classification there has not been a constitutional violation. The majority then says that the extent of budgetary limitations is not for us to decide and that the extent has been not unreasonably determined by the General Assembly and the Governor.

The Supreme Court has considered that typically subsistence payments and welfare benefits are to be regarded as general economic and social welfare measures which are to be reviewed only under the rational-relationship test. (*Dandridge v. Williams* (1970), 397 U.S. 471, 25 L. Ed. 2d 491, 90 S. Ct. 1153.) That is, the court will inquire only as to whether the classifications have a rational relationship to a purpose or end of government which is not constitutionally prohibited.

I consider, however, that here we have a subject that goes beyond a classification merely of economic and social welfare. I believe that in the case of persons with injuries

so severe or illnesses so grave that hospitalization is required to preserve life or to attempt to restore physical well-being a fundamental right—to life itself—is affected and that the State's interest in creating the classification must be compelling in order to be sustained. The classification should be subject to "strict scrutiny." I believe that here this court should not defer automatically to the classification decision by the legislative and executive branches but should require a showing that the governmental end or purpose under section 150.40 has a value so compelling as to justify this unequal treatment of injured and sick persons. What is the governmental end here? It is only to conserve funds for hospitalizations until July 1, 1983. I cannot believe that this end has a value that overrides or justifies what often will be a life-threatening discrimination against the seriously ill and injured. Too, it was not necessary to effect revenue savings by this particular means. Constitutionally proper means could have been employed as they were through other actions taken by the Governor under the Emergency Budget Act and which are approved today by this court.

Even if one accepts the majority's position that the minimal scrutiny test, that is, the rational-relationship test, should be the standard, I do not consider there is a rational or reasonable basis for discriminating against the seriously injured or ill and favoring those with less than serious conditions. Reasonableness would require that persons whose illnesses or injuries were life threatening or serious would be preferred for medical care. It seems a distortion of the natural order of values to treat those with minor complaints and turn away the gravely ill and injured. Determination of the classification here has been solely on the basis of expense reduction. I suggest that the classification is solely pragmatic, is arbitrary, and violates the guarantees of equal protection.

The plight of the ill and injured requiring hospitalization

which will ensue is not imagined but real. It is common knowledge that city and county health facilities throughout our State are already overburdened. As this dissent is written, a Chicago newspaper describes Cook County Hospital as "financially beleaguered" and reports that officials are unsure how they are going to meet the March 30 payroll. It is unrealistic to assume that those requiring hospitalization can be cared for at public hospitals.

I would also note that it has been pointed out (Nowak, Rotunda and Young, Constitutional Law 683 (1978); Tribe, Constitutional Law sec. 16-48, at 1117-18 (1978)) that despite a formal adherence in welfare cases to the rational standard by the Supreme Court, there has been careful review of classifications affecting poor persons. In *United States Department of Agriculture v. Moreno* (1973), 413 U.S. 528, 37 L. Ed. 2d 782, 93 S. Ct. 2821, the court held that a provision in the Food Stamp Act that made any household containing persons who were unrelated ineligible for food stamps violated the equal protection component of the fifth amendment's due process clause. In *United States Department of Agriculture v. Murry* (1973), 413 U.S. 508, 37 L. Ed. 2d 767, 93 S. Ct. 2832, the court held invalid a section of the Food Stamp Act that contained an "irrebuttable presumption" that disqualified a household from benefits where a member who was over 18 years of age had been claimed as a tax dependent by a nonmember of the household in the previous year.

Tribe on Constitutional Law (sec. 16—48, at 1117 (1978)), in discussing the *Moreno* and *Murry* decisions, states that the Supreme Court employed a "heightened standard of evenhandedness in dealing with the poor."

The majority here, applying the minimal-scrutiny or rational-relationship test does not undertake any review whatever of the classification. It simply says that the question of the extent of permissible budgetary limitations is not for the judiciary to decide and that the question, in-

cluding limiting hospitalizations, has been satisfactorily determined by the General Assembly and by the Governor. This constitutes an arbitrary acceptance of an arbitrary classification under section 150.40. The discrimination against the ill and injured needing hospitalization is invidious.

Finally, I would observe that while the human values involved here are beyond calculation, the expense which will be avoided through section 150.40 for the 150-day life of the Emergency Budget Act is relatively negligible, considering the total amount to be reserved under the Act. I would uphold the Act's constitutionality, as the majority has done, but I would declare that section 150.40 of the emergency rules is violative of equal protection.

JUSTICE SIMON, dissenting:

I take issue with both the "delegation" and the "equal protection" analysis in the *per curiam* opinion.

The parties to this lawsuit argued the issue of whether the Emergency Budget Act was an unlawful delegation of legislative power which permitted the Governor to eliminate the Aid to the Medically Indigent (AMI) program at his will and without legislative review. However, I see no reason to confine the statement of my views to whether an unconstitutional delegation occurred here, because the record is bare of any legislative authority for the defendants' actions in this regard in the Emergency Budget Act or elsewhere. The Emergency Budget Act (Pub. Act 82—1038) was passed as an emergency measure for dealing with a budget deficit that was estimated at $200 million in December 1982 and was expected to continue growing. Its effect was to give authority to the Governor and various other officials of State government to establish a contingency reserve of up to $164 million out of existing appropriations for fiscal year 1983, with the restriction that this reserve include no more than 2% of the 1983 appropriation to any "state agency" or 5% of any such agency's 1983

General Revenue and Common School Funds appropriation. The Emergency Budget Act was also given a repeal date of July 1, 1983, so that in no case was any reservation of appropriated funds to last beyond the end of the fiscal year. The Act is a measure relating to appropriations, and any action taken pursuant to it by the executive branch would be a specially authorized exercise of the otherwise legislative appropriations power in the sense that such action would set an upper limit beyond which an agency could not spend. (See *West Side Organization Health Services Corp. v. Thompson* (1980), 79 Ill. 2d 503.) The Act contains no provisions expressly altering any substantive obligations created by any statute. As an act dealing with appropriations it may not constitutionally be viewed as mandating such alterations (*People ex rel. Director of Finance v. Young Women's Christian Association* (1981), 86 Ill. 2d 219, 238; *Benjamin v. Devon Bank* (1977), 68 Ill. 2d 142; Ill. Const. 1970, art. IV, sec. 8(d)); on the contrary, it must be executed in harmony with the substantive laws of the State.

The Emergency Budget Act is therefore not authority for the elimination of any affirmative obligation imposed by statute, such as the AMI program (Ill. Rev. Stat. 1981, ch. 23, par. 7—1 *et seq.*). Only the legislature would have the authority to do that, by amending the existing statute. The majority is in error in suggesting that *Hill v. Relyea* (1966), 34 Ill. 2d 552, permits delegation by the legislature of discretion to eliminate affirmative obligations created by statute. In that case this court clearly stated, in the following language, that the legislature cannot permit the executive branch to decide which statutes shall remain effective and which may be disregarded:

> "There is a distinction between the delegation of true legislative power and the delegation to a subordinate of authority to execute the law. (*Lydy, Inc. v. City of Chicago,* 356 Ill. 230.) The former involves a discretion as to what the law shall be; the latter is merely an authority or

discretion as to its execution, to be exercised under and in pursuance of the law. (*People v. Warren,* 11 Ill. 2d 420; *City of Evanston v. Wazau,* 364 Ill. 198; *McDougall v. Lueder,* 389 Ill. 141.) It is an established rule that the General Assembly cannot delegate its general legislative power to determine what the law shall be. However, it may delegate to others the authority to do those things which the legislature might properly do, but cannot do as understandingly or advantageously." (34 Ill. 2d 552, 555.) The majority has unfortunately overlooked this important portion of *Hill v. Relyea.*

The majority attempts to avoid this result by contending that, inasmuch as the original 1983 appropriation for "Medical Assistance and Local Aid to the Medically Indigent under Article V [Medicaid], VI [General Assistance], and VII [Aid to the Medically Indigent]" is broken down by types of services rather than by program, there were no AMI line items in the 1983 budget for the defendants to eliminate. Thus, the majority concludes that the adoption of rules by the defendants pursuant to the Emergency Budget Act which effectively halted funding of the AMI program was not inconsistent with the funding scheme which the legislature originally approved. I disagree. The legislature may choose to provide no funding in an appropriation bill for a program which it has established by statute, but that was not the intent of the 1983 appropriation any more than it was the intent of the Emergency Budget Act. The original appropriation bill contemplated only that the service line items provided for be apportioned among Medicaid, General Assistance and Aid to the Medically Indigent pursuant to rules which the Department of Public Aid was free to adopt. It did not anticipate the nonfunding of any of these programs, and the broad discretion it vested in the Department of Public Aid did not permit the Department to cut off funding for any of the programs during the fiscal year, at least without further and specific legislative approval. Under the authorities I have cited

above, the State's substantive obligations under each of those programs remained, and the Department was not free, in the exercise of its discretion, to adopt rules in derogation of those substantive obligations while funds existed to keep them in operation.

The Department would, of course, be free to drastically reduce or eliminate funding for a mandated program such as AMI if money ran so short that it would be impossible to continue funding all similarly mandated programs governed by the same appropriation. That was the situation in *Estep v. Department of Public Aid* (1982), 92 Ill. 2d 510. However, no such shortfall has occurred here. There is no evidence that, after reserving 2% of the appropriation at issue, the Department would be unable to fund all of the programs covered by the appropriation in a manner consistent with the statutes creating those programs. Even if such a shortage should occur, the Department may at some future date receive an additional appropriation from the legislature. The majority opinion permits the Governor and his department heads to nullify programs virtually as they please under the banner of "discretion," regardless of legislative authorization and governed only by their own predilections. That is not the way our constitution envisioned that laws would be made, and even if the legislature itself had sanctioned such a scheme I "would have serious doubts as to the constitutionality of such uncabined discretion." (*Stofer v. Motor Vehicle Casualty Co.* (1977), 68 Ill. 2d 361, 373.) The courts of this State should not acquiesce in such a radical obliteration by the executive branch of a statutorily mandated program so long as the statute requiring assistance to the medically indigent remains unrepealed by the legislature.

I also disagree with the majority's disposition of the plaintiffs' argument that the limitation of inpatient hospital services under the General Assistance program by Emergency Rule 150.40 to $500 per person violates the equal

protection clauses of the State (Ill. Const. 1970, art. I, sec. 2) and Federal constitutions (U.S. Const., amend. XIV). Defendants' position is that the rule was justified by the money it would save. At the very minimum, the test to be used in assessing the equal protection challenge is whether there is a rational basis for the difference in treatment. (*United States Railroad Retirement Board v. Fritz* (1980), 449 U.S. 166, 66 L. Ed. 2d 368, 101 S. Ct. 453.) Courts generally require that, to satisfy the "rational basis" test, a law or rule must at least either further some purpose of the program or legislation in the context of which it must operate (*Stanton v. Stanton* (1975), 421 U.S. 7, 43 L. Ed. 2d 688, 95 S. Ct. 1373; *Haughton v. Haughton* (1979), 76 Ill. 2d 439) or not be inimical to the basic premises of that program or legislation (*United States Department of Agriculture v. Moreno* (1973), 413 U.S. 528, 37 L. Ed. 2d 782, 93 S. Ct. 2821). It is not enough that the rule challenged here offers the prospect of monetary savings if, in achieving those savings, it subverts the intent of the very legislation it was enacted to further. Emergency Rule 150.40 was designed to operate in the limited context of the General Assistance hospitalization program, which was established to provide "[f]inancial aid in meeting basic maintenance requirements for a livelihood compatible with health and well-being, plus any necessary treatment, care and supplies required because of illness or disability" (Ill. Rev. Stat. 1981, ch. 23, par. 6—1). Defendants do not dispute that the rule will virtually eliminate inpatient hospital services for 110,000 persons, and that those affected will typically be the ones whose treatment needs are the most acute. The rule essentially deprives all but the least seriously ill of hospitalization. The rule not only does not comport with the legislative intention of providing more care to the more seriously ill but actively subverts that intent, and in doing so affirmatively and unjustifiably discriminates against the most seriously ill. This is utterly irrational in the context of

a program whose purpose is to treat illness properly; it cannot be upheld in light of the line of cases which requires the government to treat alike individuals who are similarly situated with respect to the purposes of a statute.

The *per curiam* opinion does not even deal with this argument. Instead it recites only the general rule that the test to be employed in an equal protection context is a rational-basis test. That is all there is to the majority's analysis. There is no discussion of the facts, no speculation as to what might be the rational basis that defeats the plaintiffs' claim. Everything is left to the reader's imagination. All the *per curiam* opinion tells us is:

> "The appropriate standard of judicial review in determining whether plaintiffs were denied equal protection is the 'rational relation test.' (*United States Railroad Retirement Board v. Fritz* (1980), 449 U.S. 166, 174, 66 L. Ed. 2d 368, 376, 101 S. Ct. 453, 458-59.) If there is some reasonable basis for the classification it is not rendered invalid because the classification results in some inequality.
>
> The question of the extent of permissible budgetary limitations is not for us to decide. It has been determined in this instance by the General Assembly and the Governor, and in compliance therewith the Department has adopted regulations pursuant to which the expenditures will be made. Whether the allocation of the funds would be precisely the same were the decision ours to make is irrelevant; the fact that we might disagree does not render it irrational or invidious. We see no constitutional defect in the program and do not agree that plaintiffs have been denied the equal protection of the laws." (96 Ill. 2d at 12.)

This lack of explanation is a disservice to the plaintiffs, many of whom are seriously ill and left without hospitalization or even medical assistance by this court's disposition. I expected at the very least that the fact that the $500 threshold figure buys only about 1½ days' inpatient treatment at Cook County Hospital for a person on Medicaid

would underscore the disparity between Rule 150.40 and the legislative purpose expressed in the General Assistance program that the seriously ill who require hospitalization are to receive it, and that this would command the majority's attention. All that the *per curiam* opinion does is to cite a general rule of law that courts have the power to supply a rational basis for a law in an equal protection case (*United States v. Carolene Products Co.* (1938), 304 U.S. 144, 82 L. Ed. 1234, 58 S. Ct. 778), and then it assumes without analysis or specification of any facts that there are facts in this case which satisfy the rule. This, in my judgment, is an abdication of the judicial function that would be intolerable in any circumstance and that certainly should not be excused by the emergency nature of this proceeding.

A final observation is that there is nothing in the record to establish that excluding General Assistance recipients from the hospitalization they require for the period the Emergency Budget Act will remain in effect will actually conserve State funds. At the end of the 120-day period from the date this court vacated the injunction against limiting hospitalization (March 2, 1983) until the date the Emergency Budget Act expires (June 30, 1983) presumably there will be no further limitation on hospital payments, and General Assistance recipients will then again be able to obtain the hospitalization that the Public Aid Code provides for them and which they require. I make this assumption because the defendants have represented the Emergency Budget Act to this court as an emergency measure which will terminate at the end of the current fiscal year. Common sense tells us, however, that by the time those 120 days have gone by, the medical condition of many eligible recipients will have worsened because of lack of attention, with the result that the hospitalization and medical treatment they will then require is likely to be even more extensive and expensive than if they were

treated now. This all leads me to question whether there is sufficient rationality to the rule we are considering to pass even the most superficial of rational-relationship tests.