LARRY WAYNE HEAVNER, Plaintiff-Appellee, *v.* THE ILLINOIS RACING BOARD *et al.*, Defendants-Appellants.

Second District    No. 81-387

Opinion filed February 16, 1982.

Tyrone C. Fahner, Attorney General, of Chicago (Patricia Rosen, Assistant Attorney General, of counsel), for appellants.

Richard H. Balog, of Shearer, Blood, Agrella, Boose and Balog, of St. Charles, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

The Illinois Racing Board (hereinafter Board) appeals from the decision of the circuit court of Kane County in an administrative review proceeding in which the circuit court reversed the decision of the Board.

The plaintiff, Larry Wayne Heavner, is the owner of the horse, Brookes Pride, which was a three-year-old and eligible to race in a race known as the Cardinal Stakes. The race was sponsored by the Illinois Department of Agriculture and was to be run on May 28, 1980, at

Sportsman Park. The Department of Agriculture sent out notices indicating that entries for the race would be taken on May 16, 1980. However, the custom of the racing industry is to make the entry date 10 days—*excluding Sundays*—before the actual race. The Board's rule, No. 9.10, provides that:

> "In the event there are conflicting published conditions, the more favorable to the nominator [owner or trainer entering a horse] shall govern."

Accordingly, in order to give the owner the more favorable date, the closing entry date for the Cardinal Stakes was set for May 17 at 6 p.m., instead of May 16. A horse could also have been entered on May 16.

When the entries for the race were closed at 6 p.m. on May 17, the entry box was opened and no entry appeared in the box for Brookes Pride. Sometime later that evening, after the entries were closed, Heavner complained to Phillip Langley, Director of Racing for Chicago Downs Association, that his horse, Brookes Pride, had not been listed as an entry. A horse is entered in a race by completing an entry blank showing the horse's name, trainer or owner, and the race entered, and depositing the blank by shoving it through a slot in the entry box. Thus the names of the horses entered for any particular race are not known to anyone but the nominator until the entry box is opened. A decision to enter or not to enter a particular race might be influenced by advance knowledge of the competition this horse would face if that information was available to the owner. After discovering that Brookes Pride was not entered in the Cardinal Stakes Heavner did not claim that he himself had entered the horse, but claimed that his trainer, Jim Herman, had done so. Herman testified he placed the entry slip for Brookes Pride in the entry box on Saturday (which would have been May 17) about 2 or 2:30 p.m. (The appellants' brief is in error in stating that Herman claimed to have entered the horse on May 16. He did not specify in his testimony the date he entered the horse but testified that he entered it on Saturday, about 2 or 2:30 p.m. Saturday was May 17.) Herman had entered another horse in another race at the same time. This entry was found. In a deposition, Herman testified that he, accompanied by two of his employees, Tom Herman and Keith (or Fred) Livingston, went to the racing office about 2 p.m. on Saturday and entered Brookes Pride in the Cardinal Stakes. A thorough search of the racing office and all wastebaskets failed to turn up an entry blank for Brookes Pride.

Since Heavner contended a mistake had been made by the racing officials, Langley referred the matter to the racing stewards who, since no entry for Brookes Pride could be found, declined to enter the horse in the Cardinal Stakes. Heavner then filed another entry blank for Brookes Pride on the theory that he had an alternative entry date, since the weekly

bulletin of the Chicago Downs Association (of which Sportsman Park is a member) for the week of May 21 through May 29, showed the entries for the "Cardinal" would close on May 24 for that race. This bulletin was not an official published "condition" of the race, but the date of May 24 was printed in the schedule of events to be run off, if any elimination race was necessary. As explained in the official "conditions" for the race, the actual entry closing date was May 17, unless more than 12 horses entered the race. If more than 12 horses were entered an elimination heat would be required which would be run three days (not including Sundays) before the scheduled race date of May 28. The stewards again rejected the entry for Brookes Pride entered on May 24, holding that all information prior to the entry date of May 17 sent out by the Department of Agriculture had indicated that the closing date would be May 16 (or, as extended by the stewards, May 17) and that an elimination race, or heat, would be necessary only if there were more than 12 horses entered. Since only seven horses (or eight, if Brookes Pride was considered) were entered in the Cardinal Stakes, the alternate date of May 24 was irrelevant. In other words, the stewards held that if less than 12 horses were found to have been entered by May 17, the alternate date of May 24 was irrelevant, since that date was only applicable if an elimination race was required.

After the State stewards had ruled that Brookes Pride had not been properly entered and could not race in the Cardinal Stakes, Heavner sought a temporary restraining order enjoining the management at Sportsman Park from interfering with the running of Brookes Pride in the Cardinal Stakes. The temporary restraining order was granted and Brookes Pride ran in the race and finished second, which entitled his owner to 25% of the purse, that being in excess of $60,000. Heavner then filed a petition with the Board to review the ruling of the stewards of Chicago Downs Association declining to allow the entry of Brookes Pride in the Cardinal Stakes and withholding the Heavner share of the purse earned by that horse.

At the hearing before the Board, Heavner contended that he should have been allowed to enter Brookes Pride on May 24, since that entry date was printed in the Chicago Downs Bulletin of racing events for the week of May 21 through May 29, which created a conflict of dates and in accordance with the Board's Rule 9.10 he should have been allowed to use the more favorable date. He also contended, in accordance with Jim Herman's testimony, that the horse had actually been entered on May 17 and that in any event the Board had waived strict compliance with the entry rules because the State stewards representing the Board and Chicago Downs had violated the Board's own rules in conducting the race, and thereby lost the authority to enforce such rules. Heavner specified Rules 6.04, 9.10, 9.11 and 12.21 of the Board as having been violated

by the stewards and officials at Sportsman Park in the running of the Cardinal Stakes.

Rule No. 6.04 states:

> "No official, acting as a judge, shall serve as racing secretary or clerk of the course at such meeting. No race official shall be qualified to act as such at any meeting where he is the owner or otherwise interested in the ownership of any horse participating at such meeting."

It was shown by the testimony at the administrative hearing that Eliot Narotsky, who was acting as assistant to the racing secretary, Langley, had acted as a patrol judge occasionally at Sportsman Park. The Board held there was no violation of the rule in that, since Narotsky was not "racing secretary."

As to Rule No. 9.10, to the effect that where there is a conflict in published conditions, the date more favorable to the nominator (Heavner) shall govern, the Board held this rule was not violated since the weekly racing bulletin of the Chicago Downs Association did not constitute a published condition of the race. Moreover, the Board found that Heavner was very well aware of the correct closing date for entries in the Cardinal Stakes and had shown this by his testimony that his trainer, Jim Herman, claimed to have entered Brookes Pride in the race on May 17. Heavner admitted that he had been under the impression that Herman had entered the horse on May 17 and he had commented to other persons that perhaps Herman had "blown it," thus implying that he had intended to enter the horse on May 17 but had inadvertently failed to do so.

Rule No. 9.11 provides that the "condition books," that is, the official rules and conditions applying to the particular race, were required to be printed and available to the horse owners at least 24 hours prior to the closing date for entries. The "condition books" for Cardinal Stakes were not available in this case until about 11 p.m. on May 16, whereas these books should have been ready by 6 p.m. on that date to allow 24 hours before the closing date of 6 p.m. on May 17. Heavner testified that he would have entered the horse on May 16, around 6 p.m. when he was present at the racing office if the books had been available. The Board found that there had indeed been a lag of several hours in publishing the condition books but that this was an unavoidable accident due to a breakdown in the Xerox machine, which required several hours to repair. Moreover, the Board pointed out that Heavner had the information published in the condition books available to him in other forms at the racing office on May 16 and had made no inquiry there and did not attempt to enter the horse himself. There was testimony that the horse could have been entered by telephone on May 16, or prior to May 17.

Rule No. 12.21 states in part:

"The entry box shall be opened by the state steward, or his designated representative, at the advertised time. The state steward will be responsible to see that at least one horseman * * * is present."

Heavner claimed that this rule was violated since it was admitted by Langley that no steward was present when the entry box was opened for the Cardinal Stakes. While Timothy Schmitz, a racing steward, testified that Langley was the "designated representative" of the stewards, Langley admitted that he was not present either, when the entry box was opened. Nor did any State steward testify that he was certain that any horseman had been present when the box was opened. Eliot Narotsky testified that he opened the box and that Langley came into the office soon afterward. Langley in his testimony said:

"I was not present when the box was opened, but I arrived in my office around 6:15, and at some time between 6:15 and 6:30, these entries were placed on my desk, along with the entries for all the other races that night."

After a lengthy hearing, the Board upheld the decision of the stewards and Heavner filed a complaint for administrative review in the circuit court. In its administrative order upholding the decision of the stewards disqualifying Brookes Pride the Board made no findings as to any alleged violations of the Board's rules by Chicago Downs Association in the running of the Cardinal Stakes. The Board merely recited the known facts and held that Heavner had not entered his horse by 6 p.m. on May 17, as required by the rules, and that the purse earned by Brookes Pride should be forfeited.

Upon a review of the evidence presented at the administrative hearing, the circuit court reversed the decision of the Board. The court held that the Board is an administrative body operating under specific rules promulgated by the Board in accordance with statutory authority; that among these rules were Rules No. 6.04, 9.10, 9.11 and 12.21; that these rules had been violated in specific ways by the Chicago Downs Association. The court held that Rule 6.04, forbidding a conflict of interest was violated by Eliot Narotsky acting as assistant secretary and a patrol judge; that Rule 9.10 was violated in not allowing Heavner the more favorable entry date of May 24, since that date had also been published; that Rule 9.11 was violated when the "condition books" were not published 24 hours before the entry closings for Cardinal Stakes, and that Rule 12.21 was violated, all to the prejudice of Heavner. The circuit court therefore ruled that the failure of the Board to make any specific findings concerning the violations of its own rules was arbitrary, capricious and unreasonable and an abuse of its discretion. The court ordered that the purse earned by Brookes Pride should be given to Heavner.

In this appeal the Board contends that the circuit court erred in reversing its decision because the Board had presented evidence clearly showing that Heavner had not entered his horse on the required entry date and that as to the violation of or failure to follow certain of its own rules, these rules had been followed according to its own reasonable interpretation thereof, consistent with the known custom and practices of the horse racing industry. Moreover, the Board contended, the alleged failure to follow specifically and exactly certain of the Board rules did not cause Brookes Pride's disqualification and did not prejudice Heavner, but his own oversight was the cause of the purse being withheld and this was independent of any deficiencies of the Board in not enforcing its own rules.

We find that the Board's decision was in accord with the manifest weight of the testimony as to whether an entry was found in the entry box for Brookes Pride when the box was opened at 6 p.m. on May 17. Narotsky, who opened the box, testified the entry was not there. No one was able to testify on this point for Heavner, since those contending that the entry was made were not present when the box was opened and Narotsky's was thus the only testimony on that point.

■■ This leaves for consideration Heavner's contention that the Board has waived compliance with the racing rules by itself violating certain of these rules and therefore may not invoke the rules against him. While it is familiar law that administrative regulations enjoy a presumption of validity (*Du-Mont Ventilating Co. v. Department of Revenue* (1977), 52 Ill. App. 3d 59; *Armstrong Chemcon, Inc. v. Pollution Control Board* (1974), 18 Ill. App. 3d 753), it is equally well established that where an administrative agency adopts rules or regulations under its statutory authority for carrying out of its authorized duties, it is bound by those rules and cannot arbitrarily disregard them or apply them in a discriminate manner. (*Service v. Dulles* (1957), 354 U.S. 363, 1 L. Ed. 2d 1403, 77 S. Ct. 1152; *Citizens to Preserve Overton Park, Inc. v. Volpe* (1971), 401 U.S. 402, 28 L. Ed. 2d 136, 91 S. Ct. 814; *Holland v. Quinn* (1978), 67 Ill. App. 3d 571; *Margolin v. Public Mutual Fire Insurance Co.* (1972), 4 Ill. App. 3d 661.) In the latter case, the court said:

> "Having once established rules and regulations pursuant to statutory authority, an administrative agency is bound by those rules and regulations and may not violate them." 4 Ill. App. 3d 661, 667.

■■ In the case before us the Board clearly disregarded several violations of its own rules in deciding that Brookes Pride was not properly entered in the Cardinal Stakes. We see no merit to Heavner's complaint about Rule 6.04 (conflict of interest) since it did not prejudice him in this race. As to Rule 9.10 (regarding the proper entry date), we think the rule was properly interpreted by the Board and applied by the stewards. Rule 9.11

requiring the condition books to be available 24 hours before the closing of the entries was only violated due to an accident and was inadvertent. The breakdown of the Xerox machine was not deliberate or capricious; moreover, it was shown not to have prevented Heavner from entering his horse since the same information was readily available at the racing office. In any event, the horse could have been entered and was supposed to have been entered the next day, which would have been a correct entry date had the entry been made on that date. A violation of administrative rules which does not prejudice the plaintiff and has no effect on the issues involved may be disregarded. *Forberg v. Board of Fire & Police Commissioners* (1976), 40 Ill. App. 3d 410.

■■ However, we find a serious and reversible error in the Board's arbitrary application of Rule 12.21. While invoking a portion of that rule (the third paragraph) to justify a refusal to redraw the race as Heavner had requested, the Board completely disregarded that portion of the same rule (first paragraph) which provides as follows:

> "The entry box shall be opened by the state steward, or his designated representative, at the advertised time. The state steward will be responsible to see that at least one horseman or an official respresentative of the horsemen is present. * * *."

The testimony clearly established that no steward was present when the entry box was opened and Langley—who had never been designated as such in writing but who, the steward Schmitz said, was a designated representative of the steward—was not present either. The box was opened by Langley's assistant, Narotsky. Nor was there any evidence that the part of the rule requiring a horseman or an official representative of the horsemen to be present was complied with. Narotsky could not name any horseman who was "present" when the entry box was opened. Since Brookes Pride's trainer, Jim Herman, testified that he did put the entry in the box, there was a direct conflict in the testimony as to whether the entry had been placed in the box. But the people designated under the rules to open the entry box and determine what entries were therein could not testify about that because they were not present when the box was opened. Narotsky's testimony that the Brookes Pride entry was not in the box when opened cannot be used to establish that such was the fact when the rule clearly provides that a State steward or his designated representative—in this case Langley—shall open the box. The Board acted arbitrarily in invoking the third paragraph of Rule 12.21 in its order affirming the decision to withhold the Brookes Pride earnings, while entirely disregarding the first paragraph of that rule requiring a certain person to open the entry box. Whether the Brookes Pride entry was in the box when it was opened was the whole point in controversy. Obviously the rule is designed as a safeguard to make sure that only a responsible

person will open the entry box, thus discouraging irregularity. This is a necessary rule to insure the integrity of the entry process, and it cannot be enforced by the Board as to that part which sustains its decision, and ignored as to that part which throws a cloud on its decision. Such action by the Board was arbitrary and unreasonable and since the question of entry was the whole question at issue, it was manifestly prejudicial to Heavner.

The decision of the circuit court of Kane County is therefore affirmed.

Judgment affirmed.

SEIDENFELD, P. J., and REINHARD, J., concur.