JUAN RIVERA, Plaintiff-Appellant and Cross-Appellee, v. THE DEPARTMENT OF PUBLIC AID *et al.*, Defendants-Appellees and Cross-Appellants.

First District (2nd Division)  No. 84—1664

Opinion filed March 12, 1985.

HARTMAN, J., concurring in part and dissenting in part.

Legal Assistance Foundation, of Chicago (Steven Saltzman, Michael Collins, and Barbara J. Stob, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Karen Konieczny, Assistant Attorney General, of Chicago, of counsel), for appellees.

PRESIDING JUSTICE STAMOS delivered the opinion of the court:

In January 1984, plaintiff's benefits under the General Assistance Program (GA) (Ill. Rev. Stat., 1982 Supp., ch. 23, par. 6—1 *et seq.*) were terminated for a period of four months due to plaintiff's receipt of a lump-sum payment from the Social Security Administration (SSA) in November of 1983. Plaintiff appealed on January 10, 1984, and, after a hearing, the Director of the Illinois Department of Public Aid (IDPA) affirmed the termination in a final administrative decision issued on March 2, 1984. Plaintiff thereafter filed a complaint seeking judicial review. The trial court's order upheld the IDPA's "lump sum" rule but directed the IDPA to enforce the rule, not by cancelling GA for the appropriate time as mandated by the rule, but by continuing GA and prorating the disqualification over a six-month period.

Plaintiff Rivera is a 49-year-old disabled man who resides with his wife and seven children in Chicago. Plaintiff suffered an accident in 1974 and has been unable to work since then.

In August 1981, plaintiff filed a claim for disability benefits with the SSA seeking supplemental security income (SSI). In December 1981, while his SSI application was pending, plaintiff applied for and began receiving public assistance benefits under the GA program. In January 1982, plaintiff's wife and five children were added to the cash GA grant.

In October 1983, plaintiff's SSI claim, filed in August of 1981, was approved, and he was awarded $6,784.37 from SSA retroactive over the two-year period he was determined to have been disabled and eligible for SSI. Pursuant to an authorization agreement signed by plaintiff, SSA sent the entire award to IDPA for public assistance provided to plaintiff while his SSI claim was pending. From that sum, IDPA deducted $2,389.15 for assistance provided to plaintiff under the GA program from February 1982 through October 1983. A State warrant was drawn payable to plaintiff in the amount of $4,395.25 as the balance due plaintiff after IDPA's deduction.

On October 21, 1983, IDPA deleted plaintiff from the GA grant, effective November 1, 1983, because he would be receiving monthly SSI payments. Plaintiff was then established as the "representative payee" for the remaining GA family case. Plaintiff, however, was not informed by the IDPA of these changes.

Plaintiff received the lump sum from the IDPA in November 1983. In a notice dated January 6, 1984, IDPA informed plaintiff that, effective January 1984, his benefits under GA would be discontinued. The notice stated, "your family is ineligible to receive General Assistance

for five (5) months because of the lump sum you received from SSI. This action conforms with the statement contained in the Categorical Assistance Manual PO 510.2." Plaintiff filed a timely administrative appeal, and the family's GA benefits were thereby continued during the pendency of the action.

IDPA's temporary suspension of GA benefits was based upon its "lump sum" policy, embodied in IDPA Rule 3.387 (7 Ill. Reg. 395) and in sections PO 510.2(f) and PO 620.2(c) of IDPA's GA manual. This rule, effective January 1, 1983, renders any GA case that receives a one-time, nonrecurring cash payment ineligible for GA benefits for a period of months determined by dividing the amount of the lump-sum payment by IDPA's monthly "standard of need" applicable to the case.

At the administrative hearing on January 31, 1984, plaintiff stated that the entire lump sum he received from SSI had been spent prior to IDPA's proposed suspension of benefits, and various documents were tendered to the hearing officer as receipts to support plaintiff's claimed expenditures. The final administrative decision issued on March 2, 1984, affirmed the suspension of benefits under IDPA's lump-sum rule, but directed a recomputation of the period of ineligibility because the assistance unit was, in fact, greater than the unit included in IDPA's original calculation.

Plaintiff thereafter filed a complaint for administrative review on April 5, 1984. The complaint was subsequently amended to a writ of *certiorari.* In an order entered on May 30, 1984, the circuit court affirmed the administrative decision, but modified it such that the lump-sum disqualification period was prorated and offset against continuing assistance for six months. The modification was predicated on the court's belief that when the lump sum was sent to plaintiff, the local IDPA office had a duty to simultaneously notify plaintiff that GA would be suspended under the rule. The court thus determined that the rule would fall too harshly on the plaintiff. The court also considered why the local office did not budget the money for plaintiff. The court stated that due process required that plaintiff be given notice of the consequences of receiving the lump sum simultaneously with his receipt of the sum. The court thereafter ordered the disqualification prorated over six months instead of a blanket suspension.

Plaintiff appeals, seeking a reversal of the trial court's order, and defendant cross-appeals, seeking a reversal of that portion of the order that modified the application of its lump-sum rule by engrafting proration principles to it, and an affirmance of the portion of the order upholding the administrative decision and the lump-sum rule.

■ Plaintiff raises three points on appeal. First, that IDPA's lump-

sum rule is violative of the plain language of the Public Aid Code (Code), in the absence of a prior legislative enactment authorizing such a rule; second, that IDPA's application of its rule to plaintiff was invalid because the application was in contravention of IDPA's own interpretation of the rule as set forth in its manual; third, that plaintiff was denied due process by IDPA's failure to promptly notify plaintiff that his GA benefits would be suspended due to his receipt of the lump-sum payment.

The overriding purpose of the Code is the alleviation and prevention of poverty. (Ill. Rev. Stat. 1981, ch. 23, par. 1—1; *Lawrie v. Department of Public Aid* (1978), 72 Ill. 2d 335, 348, 381 N.E.2d 226.) To achieve this salutary goal, the allocation of the State's fiscal resources must be made with an eye toward providing relief to the greatest number of people. Economic reality demonstrates that the source of funds for public assistance programs is finite and, accordingly, any construction or application of the Code must reflect that fact. (*Miller v. Department of Public Aid* (1981), 94 Ill. App. 3d 11, 17, 418 N.E.2d 178.) The IDPA is charged with the duty of implementing rules and regulations necessary to carry out the aims of the Code "to the end that its spirit and purpose may be achieved and the public aid programs administered efficiently throughout the State." Ill. Rev. Stat. 1981, ch. 23, par. 12—13.

Plaintiff first contends that IDPA's lump-sum rule violates sections 6—1.2 and 6—2 of the Code because the rule authorized the suspension of his GA benefits even though, at the time his benefits were terminated, he had already spent the entire sum. Plaintiff argues that, under sections 6—1.2 and 6—2 (Ill. Rev. Stat. 1981, ch. 23, pars. 6—1.2, 6—2) of the Code, the IDPA, when evaluating a person's eligibility for GA benefits after receipt of the lump sum, may consider only that income which is "present or ready for immediate use" to the GA recipient. Since plaintiff had expended his entire sum, the suspension of his benefits and IDPA's rule violate sections 6—1.2 and 6—2 of the Code.

The proposition is well settled that the authority of an administrative agency to enact rules and regulations is limited by the statutory language under which the rules are enacted. (*Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 551, 370 N.E.2d 223; *City of Chicago v. Fair Employment Practices Com.* (1976), 65 Ill. 2d 108, 112-13, 357 N.E.2d 1154.) "Like a statute, an administrative rule or regulation enjoys a presumption of validity." (*Northern Illinois Automobile Wreckers & Rebuilders Association v. Dixon* (1979), 75 Ill. 2d 53, 58, 387 N.E.2d 320.) Generally, if the rule is consistent with the spirit of the statute and furthers its purpose, then the rule will be sustained. As

stated by our supreme court in *Stofer v. Motor Vehicle Casualty Co.* (1977), 68 Ill. 2d 361, 369 N.E.2d 875: "In most cases, therefore, the administrator's task is not merely to interpolate among broadly stated legislative prohibitions, but, rather, to extrapolate from the broad language of his enabling statute, and, using the regulatory tools given him by the legislature, to deal with the problems which the legislature sought to address." (68 Ill. 2d 361, 370.) In interpreting IDPA's grant of authority under the Code and its rule-making power derived from section 12—13, this court stated:

> "Wide latitude must be given to such agencies in their exercise of such discretion. The [IDPA's] discretion is broad, and its exercise will not be overturned by this court solely because we may think that the decision is unwise or because we find the policy behind it inappropriate." (*Miller v. Department of Public Aid* (1981), 94 Ill. App. 3d 11, 18, 418 N.E.2d 178.)

See also *Warrior v. Thompson* (1983), 96 Ill. 2d 1, 11, 14, 449 N.E.2d 53.

IDPA Rule 3.387, the lump-sum rule, provides in pertinent part:

> "If the assistance unit receives income in any month which, together with all other income received, *** exceeds the applicable AFDC or GA standard of need for that unit size, the assistance unit is ineligible for assistance for a specific period of time ***."

Plaintiff argues that the following two sections of the Code, which define and limit the income that IDPA can use in determining eligibility and need, prohibit the above-quoted rule. Section 6—1.2 provides in relevant part:

> "Income *available* to the person, when added to contributions in money, substance, or services from other sources *** must be insufficient to equal the grant amount established by Department regulation ***." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 23, par. 6—1.2.)

Section 6—2 governs the amount of the cash grant an eligible GA recipient can receive and instructs the IDPA as follows:

> "Due regard shall be given to the requirements and conditions existing in each case, and to the income, money contributions and other support and resources *available*, from whatever source." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 23, par. 6—2.)

Plaintiff argues that IDPA's Rule 3.387 ignores the word "available" because it treats a lump-sum payment as if it is available to meet current needs for a set period of time even if the payment has previously been spent.

We find that IDPA's rule is entirely consistent with the statutory directives. Plaintiff's reading of the Code as limiting the term "available" to mean actually or presently usable would, carried to its logical conclusion, promote activity entirely inconsistent with the purpose of the Code and its prior interpretations. Plaintiff's interpretation of "available" would encourage recipients of lump sums to spend the money as rapidly as possible so that it is no longer "presently usable" when IDPA considers the recipient's eligibility. The rapid dissipation of funds would satisfy the recipient's desire to remain eligible under the GA program. Section 1–1 of the Code explicitly states, however, that the purpose of the Code is to alleviate and prevent poverty. Rapid dissipation of funds would retard these goals and would be antithetical to self-sufficiency. More importantly, our supreme court has stated that the salutary goals were to be achieved with an eye toward providing assistance to the greatest number of persons. (*Lawrie v. Department of Public Aid* (1978), 72 Ill. 2d 335, 348.) If a recipient squanders a sum in order to continue receiving benefits to which he is no longer entitled, the net effect would be to deprive other persons who could be eligible, who have not received any lump sums of money and who are excluded from the program because of the finite nature of its resources. Such a result is patently untenable in view of the purpose of the Code and the manner in which it is to be administered.

Though the word "available" as used in this context has not been defined by our courts, plaintiff's dictionary definition is overly restrictive in terms of the nature of public assistance programs and their administration. A similar situation was presented in *Toulou v. Department of Social & Health Services* (1980), 27 Wash. App. 137, 616 P.2d 678. There, a woman receiving public assistance payments under the Aid to Families with Dependent Children (AFDC) program received a per capita payment of $500 and a tax refund of $299.42 in May of 1970, and spent almost all of it before the end of that month. She promptly reported her receipt of the money to the Department of Social and Health Services (DSHS), but made no effort to forestall ineligibility for the next two months' grants of AFDC by demonstrating that the money was used for verifiable and proper expenses, such as medical care, so that she would have still been entitled to AFDC. When DSHS suspended her AFDC benefits for June and July of 1978, the woman complained, stating that since the money was spent by the end of May, it could not be considered currently available for June and July and that she should have received her normal grant for those months. 27 Wash. App. 137, 139-40, 616 P.2d 678, 680.

The pertinent Federal statute for AFDC is 42 U.S.C. sec. 602(a)(7)

(1982). The applicable implementing regulation, promulgated by the Department of Health and Human Services, provides in relevant part that "only such net income as is actually available for current use on a regular basis will be considered, and only currently available resources will be considered." (45 C.F.R. 233.20(a)(3)(ii)(c) (1975).) Also, "net income available for current use and currently available resources shall be considered; income and resources are considered available both when actually available and when the applicant has a legal interest in a liquidated sum." 45 C.F.R. 233.20(a)(3)(ii)(d) (1979).

The Washington Court of Appeals stated: "We do not read the federal statute or the regulation made pursuant thereto that the resource or income to be available must mean that it is actually presently in hand at the moment that eligibility for a grant is determined. Even under subparagraph (D) *** , income is available as a resource and shall be considered if the recipient has a legal interest in a liquidated sum and has the legal ability to make such a sum available for support and maintenance. That language clearly contemplates that the money need not be in hand." (27 Wash. App. 137, 142, 616 P.2d 678, 682.) Citing its supreme court, the *Toulou* court went on to say that "once the funds have in fact been received or made available for disposal by the recipient, the state may consider them as available within the framework of the WAC regulations." (27 Wash. App. 137, 143, 616 P.2d 678, 682.) Since DSHS did not conclusively presume that the receipt of the money meant that it was available, the procedure used was proper. "Welfare payments which come from the taxpayer should be on the basis of actual need. There should be no approval given to recipients for hasty disposal of all nonexempt cash in order to maintain eligibility." 27 Wash. App. 137, 142, 616 P.2d 678, 681.

While there are certain differences between *Toulou* and the present case, the analogy is compelling. This court's interpretation of the statute does not require the money to be in the pocket of the recipient at the time eligibility is determined in order for it to be considered "available." Also, Rule 3.387 does not conclusively presume the availability of money because it only operates after the recipient comes into the possession of the sum; it only presumes that the recipient will budget the money over a period of time equivalent to the period that the same sum would cover if received from GA, a presumption the IDPA has the power to make. Also, plaintiff took it upon himself to expend all of his money almost immediately upon receipt of it when he knew, or certainly should have known, that his continued receipt of GA benefits were based upon need. A contrary interpretation would most certainly promote the rapid dissipation of funds, keep otherwise ineligi-

ble recipients on the assistance payroll and prevent other needy persons from receiving the assistance they require to maintain a subsistence level of income.

Plaintiff has cited numerous Federal cases in support of his position. All of the cases, the most recent of which is a 1981 opinion, deal with State statutes and regulations under the AFDC program. The essence of those cases is a prohibition on State statutes and regulations that presume the existence of resources or income sources, something that IDPA's rule does not do. Also, it is noteworthy that in 1981, Congress passed the Omnibus Budget Reconciliation Act of 1981 (OBRA). (Pub. Law No. 97—35 sec. 2304 (1981), reprinted in 1 U.S. Code Cong. & Adm. News (1981), 95 Stat. 845; 45 C.F.R. sec. 233.20(a)(3)(ii)(d) (1979).) OBRA was designed to reduce the outlay of Federal dollars targeted for social programs. OBRA amended the prior lump-sum provision under AFDC such that the receipt of a lump sum is considered income in the month it is received and in future months according to the level of support previously received. OBRA specifically allows States to consider lump-sum income as available for a set period of time. The Federal regulation was obviously the format followed by the IDPA when it enacted Rule 3.387, because Rule 3.387 is a virtual twin of the above-cited Federal regulation. It was Congress' purpose that such a treatment of a lump sum, as IDPA's rule treats a lump sum, would alleviate the wasteful result of the prior statute, which encouraged the rapid dissipation of funds in order to retain AFDC eligibility. (Senate Report No. 97—139, 97 Cong., 1st Sess., June 17, 1981, *reprinted in* (1981) U.S. Code Cong. & Adm. News 396, 771.) In a recent case in the fourth district, *Duckworth v. Miller* (1984), 127 Ill. App. 3d 1088, 469 N.E.2d 1148, the appellate court considered the suspension of AFDC benefits to a woman, with no earned income, who received an $8,500 wrongful death settlement. IDPA suspended her AFDC benefits because of the settlement. The decision was affirmed and the woman appealed arguing that IDPA Rule 3.387, the same rule as here, was contrary to the Federal AFDC statute in that its provisions could only be applied to persons having earned income. The appellate court, discussing OBRA and its history, and the fact that Rule 3.387 is a virtual carbon copy of the Federal regulation, upheld the lump-sum rule as to her even in the absence of earned income.

Though the issue in *Duckworth* is not the same issue present here, it is noteworthy that the court upheld the application of the IDPA's lump-sum rule in the cooperative context of the AFDC program. The court stated: "[W]e now join those Federal courts of review which have come down on the cost-cutting side of this issue. In our view, the para-

mount concern in this area of legislation was the conservation of all-too-scarce resources. To allow recipients to rapidly dissipate funds acquired from other sources, only to fall back upon the government as a source of income, would be counterproductive to a self-sufficient economy." (127 Ill. App. 3d 1088, 1093.) The interpretation of Rule 3.387 in a similar manner when applied to the exclusively State-funded GA program, will keep the similar public assistance systems in harmony. Plaintiff's essential argument, which we reject, is that Rule 3.387 is valid only if the Illinois legislature passes a statute, like the Federal OBRA, authorizing the promulgation of such a rule.

Plaintiff has cited a case from the Superior Court of Rhode Island which involved the identical question presented here and which ultimately accepted plaintiff's argument that the Rhode Island Department of Social and Rehabilitative Services' (RIDSRS) regulation contravened its own General Public Assistance (GPA) statute. (Mullins & Gioielli v. Murray (R.I. Super. Ct., Feb. 1984), No. 83—2173.) The Murray case involved Rhode Island's exclusively State-funded GPA system, while the instant case involves Illinois' GA program. In Murray, as here, there was no prior legislative authorization similar to OBRA. Finally, when the State department of public aid in Rhode Island brought its AFDC regulations in line with OBRA, it also included its GPA system, just as Illinois included its GA system when amending its AFDC regulations. The Murray case, however, is distinguishable and will not be followed by this court.

First, when discussing the Federal AFDC cases regarding the application of OBRA to recipients without earned income, the Rhode Island court relied on *Sweeney v. Affleck* (D.R.I. 1983), 560 F. Supp. 1118, a case which limited the application of the amendment to those recipients with earned income, a position clearly in the minority and not followed by our appellate court in *Duckworth*. (See cases cited in *Wylie v. Kitchin* (N.D.N.Y. 1984), 589 F. Supp. 505, 509, and *Duckworth v. Miller* (1984), 127 Ill. App. 3d 1088, 1093.) Second, the court's holding was premised upon the idea that the RIDSRS should have waited for the Rhode Island legislature to pass a statute similar to OBRA. Since it had not passed such a statute, the court felt the regulation "unenforceable until the Legislature itself *extends to the Director* the power to promulgate such a regulation." (Emphasis added.) (Murray, slip op. at 61.) Our research regarding the Rhode Island GPA program discloses that its DSRS was not vested with any broad and discretionary powers, as IDPA has under section 12—13 of the Code. (See R.I. Gen. Laws sec. 40—6—1 *et seq.*) The IDPA's broad powers under section 12—13 have repeatedly been upheld by the courts of this State.

*Warrior v. Thompson* (1983), 96 Ill. 2d 1, 11; *Lawrie v. Department of Public Aid* (1978), 72 Ill. 2d 335, 348; *Miller v. Department of Public Aid* (1981), 94 Ill. App. 3d 11, 18-19.

Plaintiff's first argument also asserts, as previously noted and as the plaintiff in Murray successfully argued, that IDPA should not be allowed to enact Rule 3.387 without legislative authority similar to that granted in the Federal AFDC system by OBRA. However, the three Illinois cases just cited clearly allow the IDPA to promulgate such a rule under its delegated powers embodied in section 12—13. Consequently, IDPA's lump-sum rule is a valid exercise of its administrative powers and does not violate or exceed IDPA's statutory powers.

■ Plaintiff's second point on appeal is that assuming IDPA's rule is valid, it was erroneously applied to plaintiff. Plaintiff argues that the rule clearly contemplates its application only when an assistance unit receives a lump-sum payment. Plaintiff maintains that since he was a "representative payee" when he actually received the sum, he was not part of the assistance unit and the rule should not have been applied. A representative payee is defined in IDPA's manual as follows: "If the adult with whom a child is living is not included in the assistance unit, the adult is designated Representative Payee." GA Manual sec. PO 905.

It is unquestioned that where an administrative agency adopts rules or regulations under its statutory authority, it is bound by those rules and cannot arbitrarily disregard them or apply them in a discriminate fashion. (*Heavner v. Illinois Racing Board* (1982), 103 Ill. App. 3d 1020, 1025, 432 N.E.2d 290.) Under the facts present here, however, IDPA did not violate the above-quoted law. The facts are clear that plaintiff began receiving GA benefits in December of 1981 and was part of the assistance unit through October of 1983. Pursuant to the authorization agreement signed by plaintiff, his SSI award was sent by SSA to the IDPA, which received it on October 19, 1983. IDPA deleted plaintiff from the assistance unit on October 21, 1983, effective November 1, 1983, and was thereafter established as the representative payee from that date. Plaintiff received the State warrant in November 1983. In a technical sense, plaintiff was a representative when *he* actually received his share of the SSI award. But, he was not deleted from the assistance unit until after IDPA received the award from SSA pursuant to plaintiff's own agreement. Thus, when IDPA received the award on October 19, 1983, plaintiff was a part of the assistance unit, and he was not deleted, effectively, until the first of the following month. It is beyond dispute that at the time IDPA held the award, plaintiff had a legal interest in that money and had the legal ability to make that money

available for his use, subject only to IDPA's right to a certain amount of the award, all in October of 1983. Consequently, the mere fact that plaintiff did not receive his share until November is irrelevant in terms of his assistance status in October when IDPA received and held the award for him and according to his own authorization.

Plaintiff attempts to obviate a rational application of the rule by arguing: "Mr. Rivera was deleted from the unit in October, effective November 1983. The check representing his lump-sum payment was dated November 1, 1983, and, consequently, could not have been received by him until after he was deleted from the assistance unit." Plaintiff's argument would require IDPA to forego its procedures until it knew, in fact, that the recipient had the sum in his pocket. This is an overly mechanistic approach to a system heavily burdened, scarce in resources, and highly regulated. IDPA did not delete plaintiff on October 19, when it received the award. It deleted plaintiff effective November 1, the same date as appears on the check. This appears to be a fair, reasonable, and rational way to adjust a person's status under the circumstances.

●3 Plaintiff's third argument on appeal is that he was denied due process by IDPA's failure to notify him of the consequences of receiving the lump sum contemporaneously with his receipt thereof. Plaintiff maintains that IDPA's policy assumes that the recipient of a lump sum will budget that income over a period of time in proportion to the unit's standard of need. Consequently, since IDPA failed to notify plaintiff of the forthcoming suspension of benefits contemporaneous with IDPA's remittance of the sum to plaintiff, he was not able to take knowing and effective action to maintain this money for his family's subsistence income and was, therefore, denied due process. IDPA's notice on January 6, 1984, and subsequent hearing came too late to affect the family's actions and, since the appeal was only to determine whether IDPA correctly computed the months of suspension, the denial of due process was not cured. We find plaintiff's entire argument to be without merit.

Due process requires that plaintiff be given "notice reasonably calculated, under all the circumstances, to apprise [him] of the pendency of the action." (*Greene v. Lindsey* (1983), 456 U.S. 444, 449-50, 72 L. Ed. 2d 249, 255, 102 S. Ct. 1874, 1878.) Constitutional protections in the area of public welfare benefits stem from *Goldberg v. Kelly* (1970), 397 U.S. 254, 25 L. Ed. 2d 287, 90 S. Ct. 1011, where it was determined that the withdrawal of public assistance benefits triggers constitutional restraints. (397 U.S. 254, 262, 25 L. Ed. 2d 287, 296, 90 S. Ct. 1011, 1017.) "[W]hen welfare is discontinued, only a pre-termination evidentiary hearing provides the recipient with procedural due pro-

cess." (397 U.S. 254, 264, 25 L. Ed. 2d 287, 297, 90 S. Ct. 1011, 1018.) The "termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits." (Emphasis in original.) (397 U.S. 254, 264, 25 L. Ed. 2d 287, 297, 90 S. Ct. 1011, 1018.) "Due process does not, of course, require two hearings. If, for example, a State simply wishes to continue benefits until after a 'fair' hearing there will be no need for a preliminary hearing." (397 U.S. 254, 267 n.14, 25 L. Ed. 2d 287, 298 n.14, 90 S. Ct. 1011, 1020 n.14.) The court went on to explain that due process principles required a timely notice to the recipient that detailed the reasons for the proposed termination, and that the hearing must afford the recipient the opportunity to effectively defend his claim by confronting adverse witnesses and orally presenting his own arguments and evidence. The court found these rights important in cases where recipients challenged proposed terminations because of misleading or incorrect factual information, or where there has been a misapplication of rule or policies to the particular facts present. 397 U.S. 254, 267-68, 25 L. Ed. 2d 287, 299, 90 S. Ct. 1011, 1020.

Our examination of the record relative to the administrative hearing discloses that plaintiff was afforded the opportunity to effectively defend his claim by presenting evidence and cross-examining witnesses, if they were presented. Thus, there is no constitutional deficiency in the hearing provided. Also, it is clear that plaintiff's benefits were continued during the duration of this cause upon his filing of the appeal. Though at first blush there appears to be a notification problem in that plaintiff was notified after January 6, 1984, that his benefits were terminated effective January 1984, we are convinced otherwise because, at oral arguments, counsel for plaintiff was not able to show that plaintiff would have missed a GA payment before his benefits were continued. Nor was a sufficient record provided to this court on which to base a conclusion that the IDPA's system of notifying recipients of a suspension, and their continuation of benefits pending the outcome of an appeal are constitutionally infirm under *Goldberg*.

Rather, plaintiff only argues that what is constitutionally required under these circumstances is a notice from the IDPA regarding Rule 3.387 and its impact on plaintiff's assistance unit contemporaneous with the agency's remittance of the lump sum to plaintiff. We must disagree. Receipt of notice with the lump sum to help plaintiff budget his money has no constitutional support, and we refuse to extend established principles in this area. "The fundamental requisite of due process of law is the opportunity to be heard." (*Grannis v. Ordean* (1914), 234 U.S. 385, 394, 58 L. Ed. 1363, 1369, 34 S. Ct. 779, 783; *Armstrong*

*v. Manzo* (1965), 380 U.S. 545, 552, 14 L. Ed. 2d 62, 66, 85 S. Ct. 1187, 1191.) Even assuming plaintiff had received notice from the IDPA when he received his lump sum in November of 1983, there was, at *that time*, nothing to be heard, argued, or decided. In essence, the due process requirements of *Goldberg* relative to the suspension of benefits had not yet been triggered. The constitutional restrictions of due process do not require notice to a recipient for information's sake. The constitutional requirements of *Goldberg* are designed to protect an individual's right to be heard and to confront adverse witnesses before his welfare benefits are terminated. It is clear in this case that plaintiff received adequate notice in January 1984, relative to his suspension, in order to have his benefits continued and his claims protected, all of which, on this record, satisfies the mandates of *Goldberg*. Plaintiff's argument that, under these facts, effective notification should be equated with contemporaneous notification, as stated, has no constitutional support. Plaintiff knew or certainly should have known that his assistance unit's status in the GA program would be affected by his receipt of the lump sum and that his entire involvement in the GA program was based upon financial need. It was his responsibility to take effective action relative to his receipt of that lump sum in light of Rule 3.387, which had been in effect for nearly a year. This factual setting is distinguishable from *Brengola-Sorrentino v. Department of Public Aid* (1984), 129 Ill. App. 3d 566, where the IDPA was applying *initial eligibility* standards in a haphazard and discriminate fashion.

In its cross-appeal, the IDPA urges this court to reverse a portion of the circuit court's order. IDPA contends that the lower court erroneously ordered the IDPA to enforce the remaining two months of suspension of GA pursuant to Rule 3.387 by prorating the disqualification over a six-month period and offsetting that amount against continuing assistance.

Rule 3.387 here provides in relevant part:

> "The period of time of ineligibility is the whole number of months the total income received by the assistance unit (minus the deductions and exemptions) would meet the applicable Standard of Need."

By its terms, this rule does not afford discretionary powers as to its application. The whole rule gives a specific formula for determining the period of ineligibility, in whole months. The trial court's annexation of proration principles to the rule, based apparently on its feeling that the rule would fall harshly on plaintiff and that the IDPA should have told plaintiff earlier how the rule operated, was improper.

When a trial court applies an agency's rule, the court must give

deference to the agency's own interpretation of its rule. (*Rend Lake College Federation of Teachers, Local 3708 v. Board of Community College, District No. 521* (1980), 84 Ill. App. 3d 308, 311, 405 N.E.2d 364.) This rule is especially important in the area of public assistance benefits because the Code vests great discretion in the IDPA. (*Warrior v. Thompson* (1983), 96 Ill. 2d 1, 11.) More importantly, "it is not the function of [the] court to 'second guess' the wisdom of the legislature or the 'state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients.'" (*Lawrie v. Department of Public Aid* (1978), 72 Ill. 2d 335, 348.) Consequently, the trial court erred when it annexed proration principles onto Rule 3.387, and that portion of the trial court's order is reversed.

For the foregoing reasons, the order of the trial court is affirmed as to plaintiff, and that portion of the order which annexed proration principles onto Rule 3.387 is reversed.

Affirmed in part and reversed in part.

PERLIN, J., concurs.

JUSTICE HARTMAN, specially concurring and dissenting:
I concur with the majority in that portion of the opinion which upholds the circuit court's construction of "available" funds; however, I respectfully dissent from the majority's reversal of the circuit court's order annexing proration principles onto IDPA Rule 3.387.

The IDPA rules at issue here may be individually proper exercises of administrative authority under the Code and are not constitutionally infirm, yet the combined and potentially devastating effect of their inflexible application in the instant case required some ameliorative response by the circuit court. In my opinion, the order requiring proration of the settlement deduction was such a response.

Here, a disabled father of seven, physically incapable of supporting his family through employment, applied for SSI and GA benefits. He authorized IDPA to deduct from any SSI lump-sum settlement the GA benefits he had already received. In November 1983, plaintiff was sent the balance of his SSI settlement from IDPA, after it had made its deduction. No notice from IDPA of the potential consequences of plaintiff's receipt of the check accompanied the settlement check. While such contemporaneous notice may not have been constitutionally mandated, simple justice and fairness would seem to require such notice, especially where, as here, the settlement was channeled through IDPA

itself, and was not sent by SSA directly to plaintiff. Nevertheless, plaintiff was not notified until January 1984 that his GA benefits would be terminated because of the settlement. The settlement funds, however, were then no longer available to support the family. Although plaintiff may have been improvident in spending these funds, notwithstanding the lack of prior notice, the subsequent application by IDPA of its Rule 3.387, requiring the termination of GA benefits in whole months, would have worked a substantial hardship on this family.

The rules and regulations promulgated by an administrative agency are presumptively valid; nevertheless, a reviewing court may set them aside if they are clearly arbitrary, capricious, or unreasonable. (*Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, 310, 319 N.E.2d 782; *Midwest Petroleum Marketers Association v. City of Chicago* (1980), 82 Ill. App. 3d 494, 501, 402 N.E.2d 709.) The rules which permitted the IDPA here to send a lump-sum settlement to plaintiff without affording him contemporaneous notice of the stark consequences thereof, and then, two months later to notify him that all GA benefits would be discontinued for five months, are both unfair and unreasonable. Although due process of law requires only that the opportunity to be heard be provided, "[i]t is an opportunity which must be granted at a meaningful time and in a meaningful manner." (*Armstrong v. Manzo* (1965), 380 U.S. 545, 552, 14 L. Ed. 2d 62, 66, 85 S. Ct. 1187, 1191.) The notice and hearing provided here, after the settlement funds had been depleted, were meaningless insofar as plaintiff was concerned. The circuit court's order requiring proration, therefore, would not only have alleviated the harsh consequences of the rules in this particular application, but also would have only delayed, not denied altogether, the IDPA's recovery of the settlement proceeds. Illinois circuit courts have the general authority to determine all matters in controversy arising by reason of the constitution, statute or under the common law or equity (*Skilling v. Skilling* (1982), 104 Ill. App. 3d 213, 219, 432 N.E.2d 881), and are endowed with wide discretion with respect to their general jurisdiction over legal and equitable matters (*Biggs v. Health & Hospitals Governing Commission* (1977), 55 Ill. App. 3d 501, 505-06, 370 N.E.2d 1150). The relief fashioned by the circuit court in the case *sub judice* was, therefore, appropriately adjusted to the facts presented before it and authorized by law and precedent.

For the foregoing reasons, I would affirm the circuit court's order in all respects.